Slip Op. 13-36

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| LINK SNACKS, INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Before: Leo M. Gordon, Judge <br><br> Consol. Court No. 09-00304 |

**OPINION**

[Summary judgment denied for Plaintiff; summary judgment granted for Defendant.]

Dated: March 20, 2013

Lizbeth R. Levinson and Ronald M. Wisla, Kutak Rock LLP, of Washington, DC, for Plaintiff Link Snacks, Inc.

Alexander J. Vanderweide, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for Defendant United States. With him on the brief were Stuart F. Delery, Principal Deputy Assistant Attorney General, Barbara S. Williams, Attorney-in-Charge. Of Counsel was Sheryl French, Office of Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, of New York, NY.

Gordon, Judge: This case is before the court on cross-motions for summary judgment. See Pl.'s Mot. for Summ. J., ECF No. 41 ("Pl.'s Br."); Def.'s Cross-Mot. for Summ. J. and Resp. to Pl.'s Mot. for Summ. J., ECF No. 46. Plaintiff Link Snacks, Inc. ("Link Snacks"), challenges the decision of Defendant U.S. Customs and Border Protection ("Customs") denying Link Snacks' protests of Customs' classification of the imported beef jerky within the Harmonized Tariff Schedule of the United States ("HTSUS"). Customs classified the merchandise as "[c]ured or pickled" under

subheading 1602.50.09 of the HTSUS, which carries a 4.5% duty rate. Plaintiff claims that the merchandise is properly classified as "[o]ther" under subheading 1602.50.2040 of the HTSUS, which carries a 1.4% duty rate. The court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (2006). For the reasons set forth below, Defendant's motion for summary judgment is granted, and Plaintiff's motion is denied.

## I. Undisputed Facts

The following facts are not in dispute. See Joint Statement of Undisputed Facts, ECF No. 60 ("Undisputed Facts"). Jacks Links New Zealand, a related company in New Zealand, manufactured the subject beef jerky products that were imported at the Port of Long Beach in Court No. 09-00304. Ferreira International, LTDA, a related company in Brazil, manufactured the subject beef jerky products that were imported at the Ports of JFK and Long Beach in Court No. 09-00464. The subject beef jerky consists of sliced, cooked, cured, and dried meat seasoned with salt and other spices and flavors. The subject beef jerky products do not contain cereal or vegetables.

To process and manufacture the beef jerky at issue, the following steps are taken. First, boneless beef is purchased from a Brazilian USDA approved meat supplier (takes 1 minute to 2 days, depending on negotiations). Next, the boneless beef is inspected by Quality Control for wholesomeness upon receiving it (30 minutes per delivered load). The boneless beef is then sliced (4 to 5 hours per 20,000 pounds). It is then placed into a sanitary stainless steel vacuum tumbler for 20 minutes. Seasoning, sodium nitrite, and water are then added to the vacuum tumbler (5 minutes). The meat and the ingredients are then tumbled under vacuum for 8 to 15 minutes. The meat is then

allowed to cure for 24 to 48 hours. Subsequently, the meat is placed on sanitary stainless steel hanging rods (4 to 5 hours per 20,000 pounds). The meat, still containing the rods, is then placed on stainless steel smokehouse trucks (4 to 5 hours per 20,000 pounds). The smokehouse trucks are then placed in sanitary stainless steel smokehouses (20 minutes to load 1 house). The product is then cooked with smoke cycle and smoked until all the USDA Appendix A requirements are met (3 to 6 hours). The product is then removed from the smokehouse and cooled (30 to 60 minutes). The cooled product is removed from the stainless steel rods and placed into USDA approved sanitary containers (6 hours per 10,000lbs).

    The cooked jerky is then placed into a protective liner bag (6 hours per 10,000lbs). The protective liner bag is placed into a barrier plastic bag (6 hours per 10,000lbs). Oxygen scavengers are then placed into the barrier bag, most of the air is removed, and the bag is hermetically sealed (6 hours per 10,000 lbs).[1] The hermetically sealed bag is placed into a cardboard shipping container with all the pertinent Brazilian and USDA required labels (6 hours per 10,000 lbs). The boxed jerky is then placed into 20 or 40 foot shipping containers (30 minutes to 1 hour). Thereafter, the shipping containers go to the export port (3 to 5 hour drive depending on traffic).

    The imported beef jerky is shelf-stable for 18-20 months. The parties agree that the subject beef jerky is classified under subheading 1602.50, HTSUS, as "Other prepared or preserved meat, meat offal or blood: Of bovine animals."

---

[1] For purposes of this litigation only, the Government does not contest whether the imported merchandise is in airtight containers.

## II. Standard of Review

The court reviews Customs' protest decisions de novo. 28 U.S.C. § 2640(a)(1). USCIT Rule 56 permits summary judgment when "there is no genuine issue as to any material fact . . . ." USCIT R. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). In considering whether material facts are in dispute, the evidence must be considered in a light most favorable to the non-moving party, drawing all reasonable inferences in its favor, as well as all doubts over factual issues. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Anderson, 477 U.S. at 261 n.2.

A classification decision involves two steps. The first step addresses the proper meaning of the relevant tariff provisions, which is a question of law. See Faus Group, Inc. v. United States, 581 F.3d 1369, 1371-72 (Fed. Cir. 2009) (citing Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998)). The second step involves determining whether the merchandise at issue falls within a particular tariff provision as construed, which, when disputed, is a question of fact. Id.

When there is no factual dispute regarding the merchandise, the resolution of the classification issue turns on the first step, determining the proper meaning and scope of the relevant tariff provisions. See Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1378 (Fed. Cir. 1999); Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1365-66 (Fed. Cir. 1998). This is such a case, and summary judgment is appropriate. See Bausch & Lomb, 148 F.3d at 1365-66.

While the court accords deference to Customs classification rulings relative to their "power to persuade," United States v. Mead Corp., 533 U.S. 218, 235 (2001)

(citing Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)), the court has "an independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS terms." Warner-Lambert Co. v. United States, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (citing Rocknel Fastener, Inc. v. United States, 267 F.3d 1354, 1358 (Fed. Cir. 2001)).

### III. Discussion

Classification disputes under the HTSUS are resolved by reference to the General Rules of Interpretation ("GRIs") and the Additional U.S. Rules of Interpretation. See Carl Zeiss, 195 F.3d at 1379. The GRIs are applied in numerical order. Id. Interpretation of the HTSUS begins with the language of the tariff headings, subheadings, their section and chapter notes, and may also be aided by the Explanatory Notes published by the World Customs Organization. Id. "GRI 1 is paramount . . . The HTSUS is designed so that most classification questions can be answered by GRI 1 . . . ." Telebrands Corp. v. United States, 36 CIT ___, ___, 865 F. Supp. 2d 1277, 1280 (2012).

Pursuant to GRI 1, merchandise that is described "in whole by a single classification heading or subheading" is classifiable under that heading. CamelBak Prods. LLC v. United States, 649 F. 3d 1361, 1364 (Fed. Cir. 2011). GRI 1 is applied as a substantive rule of interpretation when an imported article is described in whole by a single classification heading or subheading. If that single classification applies, the succeeding GRIs are inoperative. Mita Copystar Am. v. United States, 160 F.3d 710, 712 (Fed. Cir. 1998). Here, GRI 1 resolves the classification of Link Snacks' beef jerky,

and the court, does not reach Link Snacks' other arguments under subsequent GRIs. See Pl's Br. at 7-10; Pl.'s Supp. Legal Mem. at 6, ECF No. 66 ("Pl.'s Supp. Br.").

The court construes tariff terms according to their common and commercial meanings, and may rely on both its own understanding of the term as well as upon lexicographic and scientific authorities. See Len-Ron Mfg. Co. v. United States, 334 F.3d 1304, 1309 (Fed. Cir. 2003). The court may also refer to the Harmonized Description and Coding System's Explanatory Notes ("Explanatory Notes") "accompanying a tariff subheading, which--although not controlling--provide interpretive guidance." E.T. Horn Co. v. United States, 367 F.3d 1326, 1329 (Fed. Cir. 2004) (citing Len-Ron, 334 F.3d at 1309).

The question before the court is whether Link Snacks' beef jerky is properly classified under HTSUS 1602.50.09 as "cured" prepared or preserved beef, or under HTSUS 1602.50.2040 as "other" prepared or preserved beef. The common and commercial meaning of "cured" is the addition of salt and nitrate/nitrite to meat. See Andrew Milkowski Expert Report, Ex. 3, 8, ECF No. 41 (". . . the modern definition of curing involves the addition of nitrite. . . . "Two main ingredients must be used to cure meat: salt and nitrate.") (citing Hedrick, H. B., Aberle, E.D. Forreset, J.C. Judge, M.D. Merkel, R.A. Principles of Meat Science. Dubuque: Kendall/Hunt Publishing Company, 1994, p.134.); Wedliny Domowe, Ex. H, ECF No. 46 ("Curing is adding salt and nitrates/nitrites to meat. If you use only salt it is called salting. If you use salt and water it is called brining. The moment you add nitrates and salt to meat it is considered curing."); Dep. of Donald Thomas, Ex. G, 33, ECF No. 46 ("[A] classical meat science

definition of curing is [the 24 to 48 hour period that Link Snacks' beef was in a sodium nitrite] solution."). Link Snacks also concedes that its "beef jerky undergoes a curing process in its initial stages of production." Pl.'s Br. at 8; see also Undisputed Facts, para. 3, 7 ("The subject beef jerky consists of . . . cured . . . meat . . . The meat is then allowed to cure for 24 to 48 hours.").

This is enough for Defendant, which makes the simple, straightforward argument that Link Snacks' beef jerky must therefore be classified as "cured." The court, for its part, acknowledges the attractive simplicity to this classification of the subject merchandise, one that is difficult to overcome. Link Snacks, nevertheless, offers a creditable attempt by focusing on the common and commercial meaning of "beef jerky," which it contends is much more than simply "cured" beef.

Link Snacks argues that the further process of dehydration changes the cured beef to a completely different product, beef jerky, and that it should therefore be classified as "other" under HTSUS 1602.50.2040. It contends that Customs "seeks to define beef jerky entirely by the fact that it is dipped in a curing solution, and to ignore entirely the further processing that gives beef jerky its new identity as a finished article." Pl.'s Supp. Br. at 11. Link Snacks explains that beef jerky is dried beef that varies greatly with "common cured processed meats such as ham, bacon and hot dogs . . . ." Id. at 9-11 ("[T]he defining characteristic of beef jerky is its dried state.").

Plaintiff explains that unlike ham, bacon, and hot dogs, which are highly perishable, beef jerky is not. "Without refrigeration, these processed meats [ham, bacon and hot dogs] would only last 1 to 2 days before spoiling and developing

contaminants that could cause serious illness." Id. at 9.  In contrast, beef jerky can last for months at room temperature and 12 months or longer if vacuum packaged. Id. at 10.  Further, beef jerky has a lower moisture to protein ratio (MPR) than the other identified cured meats.  Specifically, beef jerky has a 0.75 to 1 MPR, while cooked ham has a 3.75 to 1 MPR, and a typical hot dog or bologna product has a 5 to 1 MPR. Id. at 9-10.  Link Snacks explains that because water is added to those products to improve palatability, it is common to visibly see volumes of water when opening the packaging of these products, while water is indiscernible to the naked eye in beef jerky. Id. at 10.

Next, Link Snacks relies on the U.S. Department of Agriculture's ("USDA") Food Standards and Labeling Policy Book's description of beef jerky to argue that it is not "cured" meat.  The USDA provides the following under "Jerky : [a]ll Jerky products must have a MPR of 0.75:1 or less . . . Products may be cured or uncured, dried, and may be smoked or unsmoked, air or oven dried."  Pl.'s Supp. Br. at 12 (citing Pl.'s Br. Ex. 5).  Therefore, Link Snacks argues that beef jerky cannot be "cured" beef because curing is optional for beef jerky.  Pl.'s Supp. Br. at 12.  Link Snacks' beef industry expert, Dr. Andrew Milkowski, also explains that there are uncured commercial beef jerky products sold in the United States, which he has personally purchased and examined. Id.  His review of the uncured beef jerky reveals that it has the "same range of salt, moisture and water activity as the cured Jack Link's[sic] representative product."  Id.  Dr. Milkowski states that the "water activity of all the samples satisfies the federal requirements for a product that is labeled as a shelf stable product such as beef jerky." Id.  Last, Link Snacks distinguishes beef jerky from cured meat by relying on the USDA

regulation, 9 C.F.R. § 94.4, which prohibits the importation of cured or pickled products from certain countries because of rinderpest or foot and mouth disease, yet allows dehydrated products because they are preserved by a different process than cured beef. Specifically, the regulation permits the importation of meats that have been "thoroughly cured and fully dried. . . ." 9 C.F.R. § 94.4(a)(3)(i). Link Snacks contends that the regulation "acknowledges by its very terms that "cured" and dried" are different processes and the latter is not encompassed by the former . . . ." Pl.'s Supp. Br. at 13. Therefore, Link Snacks argues that beef jerky, whose intrinsic quality is its dried state, is a separate, distinct product from "cured" beef.

These are strong arguments that beef jerky is a product defined more by its dehydration than its curing. With that said, however, the court is not persuaded they are sufficient to overcome the otherwise simple and straightforward HTSUS classification for "cured" beef that depends not on dehydration processes or specific measures like MPR, but instead on the more general characteristic of whether beef is "cured." Plaintiff's beef jerky is cured. The HTSUS classification of "cured" beef encompasses all sorts of beef products, and does not draw distinctions based upon MPR or dehydration processes. The court is reluctant to impose such distinctions not found in the HTSUS. Here, the "[c]ured" subheading, 1602.50.09, is an eo nomine provision that "include[s] all forms of the named article," even improved forms." Carl Zeiss, 195 F.3d at 1379. Therefore, although Plaintiff's beef jerky may specifically be defined by a preservative process of dehydration yielding a product with a relatively low MPR, that beef jerky, nevertheless, remains "cured" within the meaning of the HTSUS.

Accordingly, the court agrees with Customs that the correct classification of Plaintiff's beef jerky is under HTSUS 1602.50.09, "[c]ured" beef.

### III. Conclusion

The court will therefore enter judgment denying Plaintiff's motion for summary judgment, and granting Defendant's motion for summary judgment.

                                                                                             /s/ Leo M. Gordon  
                                                                                              Judge Leo M. Gordon

Dated:  March 20, 2013  
         New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| LINK SNACKS, INC., <br><br>　　　　　　　Plaintiff, <br><br>　　v. <br><br>UNITED STATES, <br><br>　　　　　　　Defendant. | Before: Leo M. Gordon, Judge <br><br> Consol. Court No. 09-00304 |

**JUDGMENT**

This case having been submitted for decision, and the court, after due deliberation, having rendered an opinion; now in conformity with that opinion, it is hereby

**ORDERED** that Plaintiff's motion for summary judgment is denied; it is further

**ORDERED** that Defendant's cross-motion for summary judgment is granted; and it is further

**ORDERED** that judgment is entered for Defendant.

　　　　　　　　　　　　　　　　　　　　　　　/s/ Leo M. Gordon
　　　　　　　　　　　　　　　　　　　　　　Judge Leo M. Gordon

Dated: March 20, 2013
　　　　New York, New York